[Cite as *In re Guardianship of Smith*, 2014-Ohio-2119.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

| | | |
|---|---|---|
| IN THE MATTER OF GUARDIANSHIP OF: | : | |
| | : | CASE NO. CA2013-09-165 |
| JAMES DOUGLAS SMITH | : | O P I N I O N |
| | : | 5/19/2014 |
| | : | |
| | : | |

APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
PROBATE DIVISION
Case No. PG13-03-0050

Tamara Sack, 9435 Waterstone Boulevard, Suite 140, Cincinnati, Ohio 45249, for James Douglas Smith

Fred S. Miller, Baden & Jones Building, 246 High Street, Hamilton, Ohio 45011, for appellants Douglas Smith and Delores Smith

Onda, LaBuhn, Rankin & Boggs Co., LPA, Derek L. Graham, 266 North Fourth Street, Suite 100, Columbus, Ohio 43215, for appellee, Advocacy & Protective Services, Inc.

**M. POWELL, J.**

{¶ 1} Appellants, Delores and Douglas Smith (hereinafter referred to respectively as Mother and Father and collectively as appellants), appeal a decision of the Butler County Court of Common Pleas, Probate Division, appointing appellee, Advocacy and Protective Services, Inc. (APSI), guardian of the person of their adult son, James D. Smith.

{¶ 2} James is a 29-year-old man who has lived with appellants his whole life. He has an IQ of 58, may be autistic, and suffers from selective mutism, Pervasive Developmental Disorder NOS, and Anxiety Disorder NOS. While he was quite verbal as a young child, over time he stopped talking. Primarily, James verbally communicates only with Mother (James speaks to her in complete sentences). James communicates daily with Father by leaving notes for him; occasionally, James speaks to Father. James graduated from high school at age 22. He has not been enrolled in any work or vocational programs or any activities since graduating from high school. James has not received any counseling relating to his mutism.

{¶ 3} Since 1998, James has a history of communicating with various individuals and places (such as hospitals, township officials, a restaurant) in a threatening way (via letters, e-mails, and telephone calls). In June 2012, he was charged with telephone harassment for repeatedly calling the police (according to Mother, James called the police to ask them a question; when they did not call back, James kept calling them back). As a result of these criminal charges, James first spent a week in jail and then three weeks in a psychiatric hospital. He was ultimately found not competent to stand trial and was referred to the probate court for guardianship proceedings.

{¶ 4} On March 12, 2013, appellants filed an application in the probate court to be appointed guardians of James' person and estate. On May 15, 2013, APSI filed an application in the probate court to be appointed guardian of James' person.[1] On August 5, 2013, the probate court held a hearing on both applications for guardianship. A court-ordered Comprehensive Evaluation of James (Joint Exhibit 2) was completed in May 2013 by

---

1. APSI's application states that it is a "not-for-profit corporation [that] contracts with the Ohio Department of Developmental Disabilities to provide guardianship (of the person only) and other protective services to Ohio adults who have mental retardation and/or other developmental disabilities."

the Southwest Ohio Developmental Center and was admitted into evidence at the guardianship hearing. A Statement of Expert Evaluation completed by a licensed psychologist was also admitted into evidence at the hearing (Joint Exhibit 1).

{¶ 5} James is appellants' only child. At the hearing, Mother testified that when he was younger, James was diagnosed with "uneven development" and "some mild retardation"; yet, he is also "very smart in some ways." She testified that James is an excellent reader, writes letters, and uses the computer she and her husband bought him. She surmised James learned how to use a computer and send e-mails by himself as neither she nor her husband use the computer.

{¶ 6} With regard to his daily routine, she testified that James likes to stay up all night, eats two meals every night, typically sleeps until noon, and around 6:00 p.m. will tell appellants if he wants to go somewhere. Because James does not eat food prepared by Mother (with the exception of Thanksgiving and Christmas), he writes down what he wants to eat and drink and Father goes out and gets James' order. When James wants to go somewhere in the evening, appellants will drive him around for hours and "go wherever he wants to go," be it Dayton, Oxford, or Fairfield (all in Ohio) or to a store such as Walmart or Barnes and Noble in Lexington, Kentucky. Appellants and James live in Hamilton, Ohio. According to Mother, James loves to record things, ride in a car, go to Walmart and Barnes and Noble, sing, and do karaoke. He used to play the piano and wants to travel around the world.

{¶ 7} Mother also testified James takes care of his personal hygiene, such as showering, shaving, and getting dressed. James used to get his own clothes out of the closet but she now picks out his clothes. Occasionally, she must redirect James when he wants to wear his pajamas out. James does not do his laundry but can use a microwave.

{¶ 8} Mother testified that in the past, it has been difficult to get James to medical

appointments; however, James has been more compliant since the probate court's involvement. James likes to go to the emergency room (ER) and until a year before the hearing, Mother would take him to the ER a couple of times a week for abdominal and heart pain (according to his mother, James has a "fast heart rate"). Once there, James would typically be diagnosed with acid reflux and constipation. James still goes to the ER but less often.

{¶ 9} James only socializes with appellants. Mother testified that James needs friends and that he was always happy in school and loved being around other children. As a result, she would like James to attend a day program. However, while James is initially agreeable to the idea, he subsequently states he does not want to go. The record shows that appellants are in their late 60s, and that Mother suffers from diabetes, acid reflux, and thyroid issues. With regard to the guardianship proceedings, Mother testified that James wants to stay at home with appellants.

{¶ 10} James' Comprehensive Evaluation recommended that several additional assessments and medical examinations be done. Mother testified that if she became James' guardian, she would cooperate with the additional evaluations and testing and that she would comply with any follow-up recommendations and treatment. She denied refusing to comply with past recommendations. However, her testimony was contradicted by the Comprehensive Evaluation. According to findings within the report, with the exception of when appellants followed up with a contracted psychiatrist some years ago, attempts by the Butler County Board of Developmental Disabilities Services (BCBDDS) to engage James in services on several occasions over the years have either been consistently blocked by appellants or not followed through.

{¶ 11} Traci Craig, an APSI employee who would be assigned to work with James, testified that APSI was a neutral party whose goal was to insure that James would receive

the services he needs and have his needs and wants met. Craig testified she was unable to meet James because Mother did not allow it. Craig, however, read James' Comprehensive Evaluation and talked to BCBDDS representatives. Craig testified that the short-term plan for James would be to place him in a small group home in Hamilton, Ohio and have him undergo several assessments and medical examinations so that his needs could be determined without any outside interference. James would have his own bedroom and would have 24-hour care. James could stay there if he liked it or go to another place. Craig could not formulate a long-term plan for James as she had not met him yet. Craig acknowledged that removing James from appellants' house could be very traumatic. However, she believed "it may be a better fit for him" in the long term.

{¶ 12} According to findings in the Comprehensive Evaluation, Mother reported she is "bullied" by her son to transport him to the ER, she is sometimes afraid of him because he threatens her and Father, and James is "aggressive" and "bullies" them "to get his way." Findings within the report further stated that James "urinates on himself and/or the floor instead of using the bathroom facilities," and as a result, the home is "saturated with urine and rotting."

{¶ 13} In a post-hearing memorandum, James' court-appointed attorney stated that (1) although she had face-to-face contact with James during two home visits, he never spoke directly to her and Mother served as the "go-between"; (2) although she never gave her former office address to either James or appellants, James sent several letters to that address, which he likely found on the internet; (3) in his letters, James told his attorney he did not want a guardian; and (4) notwithstanding James' selective mutism, he appears to be highly motivated to communicate and has some native intelligence that needs cultivating.

{¶ 14} By decision filed on August 7, 2013, the probate court appointed APSI as guardian of James' person. The probate court found that given (1) appellants' struggle over

the years to control James' actions and behaviors, (2) the fact that James has actually been controlling appellants' lives as a result of his compulsive behaviors, and (3) James' behaviors, including demanding to be driven around for hours at night, urinating on himself or the floor instead of using bathroom facilities, and reportedly being aggressive and bullying appellants "to get his way," it was in the best interest of James to appoint APSI as guardian of his person.

{¶ 15} Appellants appeal, raising one assignment of error:

{¶ 16} THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANTS WHEN IT DID NOT GRANT THEIR APPLICATION TO BE GUARDIAN OF THEIR SON.

{¶ 17} Appellants first argue the probate court erred in appointing APSI as guardian of their son's person because APSI is a virtual stranger to James; by contrast, appellants have a unique insight regarding James' needs and issues, and how to best care and manage him; and James wants to live with them in the only home he has known and where he feels comfortable.

{¶ 18} When considering an application for appointment of a guardian, a probate court must (1) first determine that a guardian is required, and (2) also determine who shall be appointed guardian. *In re Guardianship of Simmons*, 6th Dist. Wood No. WD-02-039, 2003-Ohio-5416, ¶ 17. In matters relating to guardianship, the probate court is required to act in the best interest of the ward. *In re Estate of Bednarczuk*, 80 Ohio App.3d 548, 551 (12th Dist.1992). "'Best interests' means the permanent welfare of the ward in his relation to society in view of all the circumstances." *In re Briggs*, 9th Dist. Summit No. 18117, 1997 WL 416331, *3 (July 9, 1997).

{¶ 19} A probate court has broad discretion in appointing guardians, and decisions regarding the appointment of a guardian will not be reversed on appeal absent an abuse of discretion. *In re Guardianship of Snider*, 12th Dist. Warren No. CA92-11-101, 1993 WL

471477, *3 (Nov. 15, 1993). Ohio does not have a statutory preference for the appointment of guardians. *In re Guardianship of P.D.*, 4th Dist. Washington No. 08CA5, 2009-Ohio-3113, ¶ 23. Although courts generally select the next of kin, those with familial ties, or someone acceptable to such persons on the theory that they will be the ones most concerned with the ward's welfare, they are not required to do so. *Id.* A probate court may appoint a stranger as guardian if it is in the best interest of the ward. *Id.*

{¶ 20} "At all times, the probate court is the superior guardian of wards who are subject to its jurisdiction, and all guardians who are subject to the jurisdiction of the court shall obey all orders of the court that concern their wards or guardianships." R.C. 2111.50(A)(1). Because the probate court is the superior guardian, "the appointed guardian is simply an officer of the court subject to the court's control, direction, and supervision," and has, therefore, "no personal interest in his or her appointment or removal." *In re Guardianship of Spangler*, 126 Ohio St.3d 339, 2010-Ohio-2471, ¶ 53.

{¶ 21} Appellants unquestionably love and care for their son and have cared for him and provided for his educational, medical, and social needs to the best of their ability. However, a thorough review of the record supports the probate court's findings that appellants have struggled over the years in controlling James' actions and behaviors, and that their lives are in fact controlled by their son as a result of his compulsive behaviors. The record also shows that appellants have been either unwilling or unable to engage James in needed services over the years, and that they either cannot or will not make hard decisions necessary for James. At the end of the guardianship hearing, the probate court expressed its concern, were it to appoint appellants as guardian, whether they would "be able to do the things that are necessary to get [James] into the place where he can at least have a functioning basis," as their love for him "can get in the way of making tough decisions that need to be made sometimes." If, on the other hand, the court were to appoint APSI as

guardian, "there would be a neutral person in between that could say * * * no, when the answer needs to be no."

{¶ 22} James' Comprehensive Evaluation reported that James (1) currently "might not be exposed to situations or experiences that would foster his learning or independence," (2) is seemingly "functioning somewhat lower [than] his intellectual abilities would typically indicate," (3) "appears to be an autistic individual who has regressed over the years due to living in isolation" and appellants' refusal "to allow professional staff to engage him in services," and (4) understands what is spoken to him and can follow multi-step directions. The Comprehensive Evaluation also reported that during her collateral interview, Mother failed to acknowledge or recognize James' threatening communication with others as being a significant issue, and in fact believed people were "making a mountain out of a mole hill regarding Jim's phone calls and letters."

{¶ 23} In light of the foregoing, we find the probate court did not err in appointing APSI, a detached and neutral third party, as guardian of James' person. *See In re Guardianship of P.D.*, 2009-Ohio-3113 (no abuse of discretion in appointing an objective third party as the guardian of an autistic child with other developmental disabilities, rather than the child's aunt, where the aunt was unable to impose structure in the child's life, where the child would do whatever he wanted to when living with his aunt, and where the aunt, who very much loved the child, either could not or would not make many of the hard decisions necessary for the child).

{¶ 24} Appellants also argue the probate court erred in not considering less drastic alternatives to appointing APSI as guardian of James' person, such as providing appellants with in-home assistance or the opportunity to seek education and guidance regarding James.

{¶ 25} R.C. 2111.02(C)(5) requires a probate court to consider a less restrictive alternative to guardianship if such evidence is introduced at the guardianship hearing. A

probate court may deny a guardianship if it finds a less restrictive alternative exists. R.C. 2111.02(C)(6); *Davis v. Cuyahoga Cty. Adult Protective Services*, 8th Dist. Cuyahoga No. 77116, 2000 WL 1513752 (Oct. 12, 2000). In the case at bar, no evidence of a less restrictive alternative to guardianship was presented at the hearing. Because the probate court "was presented with no evidence to consider, it could not have erred by failing to do so." *In re Guardianship of Bauer*, 3d Dist. Seneca No. 13-06-15, 2006-Ohio-4843, ¶ 10.

{¶ 26} In light of the foregoing, we find that the probate did not abuse its discretion in appointing APSI, rather than appellants, as guardian of James' person. The probate court had the responsibility of determining what is in the best interest of James and it made a difficult, yet proper, decision. *See In re Briggs*, 1997 WL 416331.

{¶ 27} Appellants' assignment of error is accordingly overruled.

{¶ 28} Judgment affirmed.

HENDRICKSON, J., concurs.

RINGLAND, P.J., concurs separately.

**RINGLAND, P.J., concurring separately.**

{¶ 29} I concur with the majority opinion, however, I write separately out of concern for the effects of a sudden, full-time transfer of James to a group home. I would urge the trial court to consider whether it would be in the best interests of James to effectuate the change in custody slowly and incrementally. As an autistic 29 year old, James has relied wholly on his parents for his entire life. As a result, it is likely he will not be amenable to such a sudden and dramatic change in his living situation. I would therefore implore the trial court to evaluate whether small steps taken in stages during this transition may help to alleviate the trauma for both the parents and James.