[Cite as *In re Guardianship of Cooper*, 2019-Ohio-3526.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**CHAMPAIGN COUNTY**

IN THE MATTER OF THE     :
GUARDIANSHIP OF ROBIN COOPER :

            :   Appellate Case No. 2018-CA-36

            :

            :   Trial Court Case No. 2018-GI-13

            :

            :   (Appeal from Probate Court)

            :

            :

            :

. . . . . . . . . . .

O P I N I O N

Rendered on the 30th day of August, 2019.

. . . . . . . . . . .

JANE A. NAPIER, Atty. Reg. No. 0061426, Assistant Prosecuting Attorney, Champaign
County Prosecutor's Office, 200 North Main Street, Urbana, Ohio 43078
  Attorney for Appellee, Champaign County Adult Protective Services

THOMAS M. KOLLIN, Atty. Reg. No. 0066964, 3725 Pentagon Boulevard, Suite 270,
Beavercreek, Ohio 45431
  Attorney for Appellant, Robin Cooper

. . . . . . . . . . . .

WELBAUM, P.J.

{¶ 1} Robin Cooper appeals from a judgment appointing a neutral third-party, Steve Massie, as the guardian of his person. Cooper contends that the trial court abused its discretion because the evidence established that appointing his fiancée, Janet Stricker, was in his best interest.

{¶ 2} We conclude that the trial court did not abuse its discretion in appointing a neutral, non-related party as Cooper's guardian. Ohio does not have statutory preferences in this area. Courts generally appoint the next of kin, those with family ties, or someone acceptable to the ward, based on the theory that these people will be most concerned with the ward's welfare. However, courts have great discretion in this matter and are not required to appoint such persons. Instead, a stranger may be appointed as guardian if it is in the incompetent's best interests. There was ample evidence that the court's selection of a guardian was in Cooper's best interest.

{¶ 3} Accordingly, the judgment of the trial court will be affirmed.

I. Facts and Course of Proceedings

{¶ 4} In August 2018, Steve Massie filed an application to be appointed the guardian of Cooper's person. Massie also filed a statement of expert evaluation by Dr. Amita Patel, who had examined Cooper in March 2018, and had found him mentally and physically impaired. Dr. Patel also deemed Cooper incompetent based on Cooper's poor decisions and poor safety awareness. An investigator's report was subsequently filed, noting that Cooper did not object to a guardianship, as long as Stricker would be his guardian.

{¶ 5} The investigator questioned Cooper's judgment based on an Adult Protective Services ("APS") case describing abuse and neglect and a tumultuous relationship between Cooper and Stricker. He also noted that Stricker was demanding Cooper's money to pay for rent for her house trailer. As a result, the investigator stressed that if Stricker were appointed guardian, "abuse and exploitation issues would arise." In contrast, if Massie (a neutral third party) were appointed, "these issues would resolve." In addition, Cooper had been diagnosed with depression, dementia, and profound Parkinson's disease. The investigator, therefore, recommended that a guardian of Cooper's person be granted to assure that Cooper's physical needs were met.

{¶ 6} On September 7, 2018, the trial court held a hearing on the guardianship. Cooper was represented by appointed counsel. At the hearing, the parties agreed that Cooper was incompetent and needed a guardian. They also stipulated to the statement of evaluation that had been filed.

{¶ 7} The Champaign County Prosecutor, representing APS, also called several witnesses, including two deputies from the Champaign County Sheriff's Department; an APS worker; a supervisor for the Passport Program at Catholic Social Services ("Passport"), which provided home services to Cooper and Stricker; and the social services director at the Arbors, a nursing home where Cooper was living at the time of the hearing. The court also heard testimony from Cooper, Stricker, and Massie. After hearing the evidence, the court concluded that Cooper's best interest would be served by appointing Massie as guardian. The court finalized Massie's appointment on September 18, 2018, and this timely appeal followed.

## II.   Alleged Abuse of Discretion

**{¶ 8}** Cooper's sole assignment of error states that:

The Trial Court Abused Its Discretion in the Appointment of Appellant's Guardian.

**{¶ 9}** Under this assignment of error, Cooper contends that the trial court acted arbitrarily in appointing Massie as guardian of Cooper's person, because Cooper had asked for his fiancée, Stricker, to be appointed.   Cooper also claims that appointing Stricker was in his best interest.

**{¶ 10}** Under R.C. 2111.02(A), probate courts have the power to appoint a guardian of the person of an incompetent, upon the application of any interested party. "A guardian of the person is responsible for the care and well-being of the ward * * *."   *In re Guardianship of Santrucek*, 120 Ohio St.3d 67, 2008-Ohio-4915, 896 N.E.2d 683, ¶ 2, fn.1.   R.C. 2111.02(B)(1) further provides that such a guardian may be appointed "[i]f the probate court finds it to be in the best interest" of the incompetent person.   The term "best interest" has been described as "the permanent welfare of the ward in his relation to society in view of all the circumstances."   *In re Briggs*, 9th Dist. Summit No. 18117, 1997 WL 416331, *3 (July 9, 1997).

**{¶ 11}** Probate courts have broad discretion in appointing guardians, and we will not reverse their decisions unless there is an abuse of discretion.   *In re Money*, 2d Dist. Montgomery No. 24956, 2012-Ohio-4450, ¶ 10.   An " 'abuse of discretion' has been defined as an attitude that is unreasonable, arbitrary or unconscionable. * * * It is to be expected that most instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary."   *AAAA Ents.,*

*Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990).

**{¶ 12}** Before addressing the evidence, we note that the trial court did not have to accede to Cooper's choice of guardian. Notably, Ohio lacks any statutory preference in appointing guardians, and courts have not given significant weight to a ward's preference. *In re Smith*, 12th Dist. Butler No. CA2013-09-165, 2014-Ohio-2119, ¶ 19; *Briggs* at *3; *In re Guardianship of Waller*, 192 Ohio App.3d 663, 2011-Ohio-313, 950 N.E.2d 207, ¶ 24 (1st Dist.). "Although courts generally select the next of kin or those with familial ties or someone acceptable to such persons on the theory that they will be the ones most concerned with the ward's welfare, they have great discretion in this matter and are not required to do so. Courts may appoint a stranger as guardian if it is in the best interes[t] of the incompetent." *In re Terzano*, 11th Dist. Lake No. 90-L-14-050, 1990 WL 199103, *2 (Dec. 7, 1990).

**{¶ 13}** In deciding that appointing Massie as guardian was in Cooper's best interest, the trial court made a number of findings. Specifically, the court observed that: while under Stricker's care, Cooper left their home during adverse conditions without sufficient protective clothing; that the couple did not have a working furnace; that the trailer was extremely cluttered; that Stricker struggled to keep the trailer clean and to maintain utilities; that the couple engaged in heated arguments and Stricker was reported to have been physically abusive; that Stricker required her own assistance, including meals, nursing, and housekeeping, six days a week; that Cooper's health continued to decline, making a fall in the cluttered trailer very likely due to his difficulty in walking; that Stricker was unrealistic about her ability to care for Cooper and about Cooper's mental or physical

condition; and that APS had recommended Massie, who was an experienced guardian for persons in nursing homes and group homes.   Entry, Doc. #45, p. 2.

{¶ 14} Our review of the evidence indicates that the court's decision was not arbitrary, capricious, or unreasonable.   To the contrary, ample evidence supported the decision and the court's findings.

{¶ 15} At the time of the hearing, Cooper was 66 years of age, and Stricker was 67 years old.   They had lived together for 17 years and had moved to Champaign County a little more than two years before the hearing, i.e., around 2016.   Cooper and Stricker had purchased a trailer and lived at 208 Maple Wood Circle in Urbana, Ohio.

{¶ 16} Cooper's first admission at Arbors, a nursing home, was in February 2016. The concern leading to this admission was that Cooper had been found walking out on the road after being kicked out of the trailer.   Cooper had Parkinson's disease and stayed at Arbors for about three months.

{¶ 17} In July 2016, Cooper was first enrolled in Passport, which is a federal and state-funded program that provides in-home services like those one would get in a nursing home.   In order to qualify, an individual must be over 60 years old, be on Medicaid, and have certain needs.   Beginning in July 2016, a personal care aide and a social worker went to Cooper's trailer.   Cooper also had an emergency response system, a medication dispenser, and some incontinence supplies.

{¶ 18} The personal care aide helped Cooper with bathing, dressing, grooming, and housekeeping, and occasionally ran errands.   Cooper's Passport case notes contain several notations about the fact that Cooper and Stricker were arguing and would not let his aide complete her work.   As a result, the aide would leave.   Some aides also refused

to return because the work they had done had been completely reversed when they returned, and the trailer was like it had been when it was initially cleaned. Throughout the time that Cooper was on Passport the house was very cluttered. Sometimes Cooper and Stricker had pathways through the clutter; sometimes they did not.

{¶ 19} Deputy Erich Hopkins of the Champaign County Sheriff's Department testified that he had been to the Maple Wood address multiple times. On August 10, 2016, Hopkins went to the trailer on a domestic call. The parties had engaged in a verbal dispute, and Cooper left the residence and was walking to Springfield, Ohio. Once Cooper left Champaign County, Hopkins lost jurisdiction. However, the Clark County Sheriff's Department was able to make contact with Cooper and determined that he was alright.

{¶ 20} On September 8, 2017, Stricker called the police and said that Cooper had walked away from the trailer. When Hopkins and another deputy arrived at the trailer, Stricker said that Cooper had returned and everything was fine.

{¶ 21} Another call occurred on October 13, 2017. This call was from a professional caretaker, who stated that Stricker was abusing Cooper. When Deputy Hopkins arrived, Cooper would not talk to him, and Stricker denied that anything had occurred. Hopkins did not see marks or signs of abuse and closed the matter because he did not have enough evidence to proceed.

{¶ 22} Dennis Lyons is also a deputy with the Champaign County Sheriff's Department. On October 20, 2017, a neighbor called the police and reported that she heard arguing coming from the front door of Stricker and Cooper's trailer. After arriving at the trailer, Lyons spoke with both Cooper and Stricker. Cooper appeared to be

confused and was unable to provide certain information about the incident. Stricker stated that Cooper was in the early stages of dementia, which was consistent with Lyons's observations. Both residents said they felt safe, so Lyons left them there and forwarded the matter to APS.

{¶ 23} The first referral to APS about Cooper had actually occurred more than a year earlier, in late November 2016. The furnace at the trailer did not work, so Cooper and Stricker were heating the trailer with electric heaters and the stove. This was concerning due to the clutter in the trailer. An APS worker, Tracy Clarke, gave them contacts for community resources. In December 2016, when Clarke followed up, Cooper and Stricker were still in the same situation and were on a waiting list to get help with the furnace.

{¶ 24} Clarke returned on January 12, 2017, and the situation was the same. Subsequently, on January 23, 2017, Clarke was called because Cooper had left the trailer and was walking on foot. By the time Clarke arrived, Cooper had walked through the trailer court and was getting ready to walk out on U.S. Route 68. It was almost evening and was getting dark. The weather was cold, with sleet and rain. Clarke observed that Cooper was very pale, had nothing with him, and was shaking because of his Parkinson's disease and the cold. Cooper said that Stricker had hit him in the back of the head and was bossing him around; he also said he was tired of it and did not want to be there anymore.

{¶ 25} By that time, a police officer had arrived, and an emergency squad had been called. Cooper was taken to the hospital to be checked, and no injuries were found. Because Cooper did not want to go home, a shelter in Urbana kept him overnight. The

next day, Arbors agreed to take Cooper again. APS then closed the case in mid-February 2017, because Cooper intended to stay at Arbors long-term and was in a safe, protected environment. However, two days later, APS was contacted again because Cooper wanted to go home to Stricker. Ultimately, Arbors released Cooper in late March 2017, and he went home. While Cooper's condition had declined since the 2016 admission, he was able to get around and was capable of making some decisions; as a result, he was not released against medical advice. Furthermore, both Cooper and Stricker had in-home services through Passport. An in-home aide was at the trailer on a daily basis, and they had a nurse, a counselor, and a case manager.

{¶ 26} As noted, the police were called several times during 2017 to investigate domestic issues between Cooper and Stricker. In December 2017, the trailer was also treated for cockroaches.

{¶ 27} In February 2018, Cooper was again admitted to Arbors. That time, he was found walking down the highway with no shoes and practically no clothes on, because he had been kicked out of his home. Jennifer Blankenship, the social services director at the Arbors, stated that this time, Cooper was different from the prior admissions. His shaking had increased and his ability to walk was not as good. Blankenship could also tell a difference in Cooper's safety awareness, speech, and ability to make good choices.

{¶ 28} During this admission, Arbors contacted APS due to concern that Cooper would want to return home. Arbors feared that if Cooper returned home, he would be placed in poor living conditions, clutter, and domestic violence. There was also concern over his health. In addition, Arbors felt Cooper's money was being manipulated and that

Stricker wanted him back home because she would not be able to maintain the trailer if he was not there to help financially.

{¶ 29} In early March 2018, Dr. Patel, Arbors' house psychiatrist, medically evaluated Cooper and deemed him incompetent due to his poor decisions and poor safety awareness. At the time of the September 2018 hearing, Cooper was still residing at Arbors.

{¶ 30} In the meantime, in June 2018, the APS worker, Clarke, received a referral noting that the electricity at the trailer had been shut off. Clarke referred Stricker to a community organization, Bridges, for help. Clarke subsequently talked to Stricker, who said the electricity was back on. However, when Clarke asked if she could come to see the trailer, Stricker refused, stating that the trailer was a mess and that she had cockroaches and mice. Stricker said she would call Clarke when she cleaned up the trailer.

{¶ 31} The week of the guardianship hearing, Stricker called Clarke, and Clarke went to see the trailer. At that time, the kitchen and bathroom were clean and the living room had enough space to sit in the chairs. The bedroom was cluttered, but Clarke could walk in and get to the half of the bed that was clear. However, the floor was dirty. A back room in the trailer was completely full of clutter, almost to the ceiling. The property had also been treated recently for roaches.

{¶ 32} The application for guardianship was filed in early August 2018. While residing in Arbors, Cooper's health had further declined. He had trouble walking, which was being addressed in physical therapy. An aide was with Cooper when he walked, because of his inability to walk in a straight line. Due to the disease process, Cooper

also had to walk backwards if he stopped walking, in order for his brain to tell his legs to move properly. He was receiving occupational therapy as well.

{¶ 33} During the hearing, Cooper testified and said that he wanted to live with Stricker. He felt he could be safe at the trailer with his electric wheelchair and electric cart. Stricker also testified that Cooper would be safe at the trailer, due to various kinds of equipment she had gotten. In addition, Stricker said she understood that she needed to keep the trailer clean, and stressed that she had continued with counseling after Cooper was admitted to Arbors the last time. She did not feel there would be any more arguments and denied wanting Cooper home so he could pay his share of the bills. This testimony was contradicted, however, by the low amount of Stricker's income compared to her expenses and by evidence that Stricker had verbally abused Cooper during his last admission at Arbors and did not interact well with the staff.

{¶ 34} Finally, Steve Massie testified. Massie had worked as an investigator for the Champaign County Sheriff's Office and had retired after 28 years. At the time of the hearing, Massie was a reserve deputy and worked at the Clark County Sheriff's Office in property and evidence. Massie was not related to Cooper and had been asked by the Champaign County Department of Job & Family Services if he wanted to be Cooper's guardian. Massie had experience as a guardian, and had several other wards for whom he was caring at the time of the hearing. In addition, Massie stressed that he did not want to be a guardian for Cooper's money.

{¶ 35} In view of the above facts, the trial court did not abuse its discretion by appointing Massie as guardian of Cooper's person. Instead, ample evidence supported the conclusion that the appointment was in Cooper's best interest. Accordingly,

Cooper's sole assignment of error is overruled.


### III.   Conclusion

**{¶ 36}** Cooper's sole assignment of error having been overruled, the judgment of the trial court is affirmed.


. . . . . . . . . . . . .


DONOVAN, J. and TUCKER, J., concur.



Copies sent to:

Jane A. Napier
Thomas M. Kollin
Janet Stricker
Steve Massie
Hon. Lori L. Reisinger