[Cite as *In re Guardianship of Glasgow*, 2022-Ohio-1366.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY

|  |  |  |
|---|---|---|
| IN THE MATTER OF THE GUARDIANSHIP OF: | : |  |
|  | : | CASE NO. CA2021-08-074 |
| MARY ANN GLASGOW | : | O P I N I O N<br>4/25/2022 |
|  | : |  |
|  | : |  |
|  | : |  |

APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
PROBATE DIVISION
Case No. 20202098

Dearie, Fischer & Mathews, LLC, and John A. Fischer, for appellant.

Young & Alexander Co., LPA, and Anthony V. Graber & Eli T. Sperry, for appellee.

**HENDRICKSON, J.**

{¶1}  Appellant, Mary Ann Glasgow, appeals a decision of the Warren County Court of Common Pleas, Probate Division, finding her incompetent and appointing appellee, Eli T. Sperry, as guardian of her person and estate.  For the reasons that follow, we affirm the probate court's decision.

{¶2}  Glasgow is an 86-year-old woman who has been residing at Cedar Village, a

nursing home in Warren County, Ohio since February 2019, following diabetes complications that led to the amputation of her toes. Prior to March 2019, Glasgow resided at her home in Amberly Village, Ohio. Once she moved into the nursing home, Glasgow, with the assistance of friends, arranged for autopay of her home's utilities and for the boarding of her cats. Glasgow believed insurance should pay for her stay at Cedar Village and she was unwilling to cooperate in the Medicaid application process when insurance would not cover the cost. Glasgow has an unpaid balance of over $315,000 for her stay in the nursing home.

{¶3} On November 16, 2020, Sperry, an attorney, filed an application with the probate court for appointment as guardian of Glasgow's person and estate. Sperry contended Glasgow was incompetent by reason of a "neurocognitive disorder and psychosis NOS." The application was accompanied by a statement of expert evaluation prepared by Dr. Kara Marciani, a licensed clinical psychologist and board-certified forensic psychologist. After meeting with Glasgow for one hour and fifteen minutes, speaking with some of the nurses who provided care to Glasgow at the nursing home, and reviewing medical records related to Glasgow's physical therapy plan of care, progress notes from Glasgow's treating physician at the Neuropsych Center of Greater Cincinnati, history and physical examination reports from a physician from Bethesda North Hospital who treated Glasgow, and Glasgow's chart from Cedar Village, Dr. Marciani determined Glasgow was mentally impaired as a result of dementia and mental illness. Dr. Marciani noted Glasgow had been diagnosed with psychosis NOS and was receiving treatment for delusions. Glasgow exhibited disorganized and tangential thought processes, interacted in a guarded, suspicious, and paranoid manner, presented with deficits in memory and executive functioning, and exhibited impaired orientation, motor behavior, thought processes, memory, concentration, comprehension, and judgment. Dr. Marciani noted that Glasgow

was also physically impaired, as she was bed-bound following the amputation of her toes. Glasgow grossly minimalized the severity of her deficits, insisting that she could care for herself and refusing assistance offered to meet her basic needs. Dr. Marciani opined that Glasgow's conditions were stabilized at the nursing home but were not reversible. The doctor recommended that a guardian be appointed for Glasgow's person and estate, as Glasgow was physically unable to care for her basic needs, unable to appropriately identify, prioritize, or develop a plan to meet her needs, unable to independently make decisions concerning medical treatment and her diet, and unable to apply reason to the decision-making process as it related to the management of her finances.

{¶4} The probate court appointed Jamie Carr to investigate the need for a guardian. Carr evaluated Glasgow in December 2020 and filed an investigator's report with the court on December 29, 2020. Carr's report indicated Glasgow had impairments in orientation, thought process, memory, judgment, concentration, and comprehension. Carr noted that "Glasgow does not appear to understand her medical conditions and abilities." Carr also noted that due to Glasgow's physical impairments, Glasgow was incapable of dressing, transferring from her bed, toileting, handling personal finances, shopping, driving, preparing a meal, doing housework, or taking her medications without assistance. Carr opined that Glasgow was "totally dependen[t]" on others for nearly everything except feeding herself. Carr recommended the appointment of a guardian for Glasgow's person and estate.

{¶5} Glasgow, through counsel, sought an independent medical examination. Dr. Marvin D. Reed, a clinical psychologist, was appointed by the probate court. On June 15, 2021, Dr. Reed met with and tested Glasgow for four hours. He also spent more than three hours reviewing records of Glasgow's case history, including records from the probate court and medical records from Cedar Village. Dr. Reed conducted a mental status exam, the

Short Blessed Test, the St. Louis University Mental Status Exam, Rey Memory Tests, the Subtests of the Wechsler Abbreviated Scale of Intelligence (WASI-II) and observed impairment to Glasgow's motor behavior, thought process, affect, memory, judgment, concentration, and comprehension. From his testing and observations, Dr. Reed found that Glasgow was mentally impaired as a result of moderate dementia and mental illness, specifically mixed-type delusional disorder. Glasgow was also physically impaired, requiring "total care for her activities of daily living due to multiple medical diagnosis." In Dr. Reed's opinion, Glasgow lacked the "physical mobility to care for her own activities of daily living" and "lack[ed] the mental decision-making capability and competence to assure medical treatments, diet and daily living." Dr. Reed noted that Glasgow's conditions were not reversible and were not stabilized, as they would worsen as time went on. On June 25, 2021, he filed an expert evaluation with the probate court recommending that a guardianship be established over Glasgow's person and estate.

{¶6} A hearing on Sperry's application for guardianship was held on July 20, 2021. At that time, the probate court heard testimony from Dr. Marciani and Dr. Reed, as well as testimony from Kara Stolly, a social worker at Cedar Village, Wendi Smith, the business manager at Cedar Village, and from Glasgow. Dr. Reed and Dr. Marciani summarized their written evaluations, which were admitted into evidence. Both doctors testified that to a reasonable degree of medical certainty, Glasgow was incompetent and in need of guardianship for her person and estate as she was unable to care for herself or manage her finances. When questioned by Glasgow's counsel about whether Glasgow could leave the nursing home and return to her own home, Dr. Reed indicated it might be possible if she had a live-in caregiver and accommodations were made to the home to allow for a wheelchair. Dr. Marciani disagreed, stating that Glasgow required intensive, hands-on care beyond that which a traditional live-in caregiver could give. She noted that Glasgow needed

"manual intervention and machines to help her function" and that staff at the nursing home had to use a lift to transfer Glasgow from her bed into the wheelchair.

{¶7} Dr. Marciani testified that in addition to conducting her December 2019 evaluation of Glasgow, she met with Glasgow a second time for approximately one hour on July 15, 2021, less than a week before the final hearing. Although Glasgow refused to cooperate with testing during both visits, Dr. Marciani was able to observe Glasgow's physical and mental impairments. Not only was Glasgow unable to walk on her own, cook, clean, toilet herself, reposition herself to avoid bedsores, or bathe herself, but she was also not capable of making decisions concerning her medical needs or finances. Dr. Marciani opined that Glasgow lacked insight into the nature and severity of her physical and cognitive defects and her decision-making abilities were substantially impaired by her inability to appropriately identify her needs or execute plans to meet those needs. Dr. Marciani noted that although Glasgow had lost her toes because she had not been properly managing her diabetes, she continued to refuse to take insulin and other medications designed to treat her diabetes and keep her healthy.

{¶8} Stolly testified that Glasgow was unable to handle daily living activities, other than feeding herself, and Glasgow's needs were met by nursing home staff. Stolly described an incident that had recently occurred, where Glasgow had tried to discharge herself from the nursing home. Glasgow had a friend come to the nursing home to take her away, but Glasgow was unable to transfer herself from her wheelchair into the friend's vehicle. An ambulance had to be called to transport Glasgow to a nearby hospital after she refused to return to Cedar Village. Stolly testified Glasgow would benefit from the appointment of a guardian to help manage her finances and assist with decision-making. Stolly expressed concern that Glasgow would try to return to her home and care for herself, something Stolly believed Glasgow was unable to do. She stated that if Glasgow were

permitted to return home, she expected Glasgow to "very quickly" end up back in the hospital.

{¶9} Smith testified that Glasgow has been staying at Cedar Village since February 2019. Glasgow's insurance did not cover her stay at Cedar Village, a fact that had been shared with Glasgow a number of times. Smith made multiple requests that Glasgow sign a Medicaid application so that payment through Medicaid could be sought, but Glasgow refused to cooperate. As of the date of the hearing, Glasgow had an outstanding balance at Cedar Village of $315,646.25.

{¶10} Glasgow testified that no one from Cedar Village, including Smith, had talked to her about the outstanding balance she owed at the nursing home. Rather, when she questioned staff members about how her stay was being paid for, she claims she was told that her insurance was covering everything. Glasgow denied that a guardianship was needed, contending that she was able to manage her financial affairs. She believed that the medical practitioners, nursing home staff, and Sperry were "in cahoots" with one another to act against her. She also believed she was physically capable of caring for herself in her own home and noted that for the past two years she had maintained her Amberly Village home by setting her bills up on autopay and by having friends check on the house.

{¶11} After hearing the foregoing testimony and considering the experts' evaluations of Glasgow, the probate court issued a decision finding Glasgow incompetent and granting Sperry's guardianship application over Glasgow's person and estate. The court concluded that "Glasgow is unable to live independently and has no viable plan for her to live in her residence even with round-the-clock services provided." The court further found that there was not a less restrictive alternative to guardianship.

{¶12} Glasgow appealed the probate court's decision, raising the following as her sole assignment of error:

{¶13} THE TRIAL COURT ERRED BY APPOINTING A GUARDIAN OVER MS. GLASGOW'S PERSON AND ESTATE.

{¶14} Glasgow contends there was not sufficient evidence introduced at the hearing to demonstrate that she was incompetent and that a guardianship over her person and estate was necessary. She further contends that the medical evaluations conducted by Dr. Reed and Dr. Marciani were not reliable as they were "quick, cursory, and not appropriate to fully evaluate" her physical or mental condition.

{¶15} R.C. 2111.02(A) provides that "[i]f found necessary, a probate court on its own motion or on application by any interested party shall appoint, subject to divisions (C) and (D) of this section and to section 2109.21 and division (B) of section 2111.121 of the Revised Code, a guardian of the person, the estate, or both, of a minor or incompetent[.]" An "incompetent" is "[a]ny person who is so mentally impaired, as a result of a mental or physical illness or disability, as a result of intellectual disability, or as a result of chronic substance abuse, that the person is incapable of taking proper care of the person's self or property * * *." R.C. 2111.01(D)(1). The applicant for a guardianship of an alleged incompetent individual bears the burden of proving incompetency by clear and convincing evidence. R.C. 2111.02(C)(3). Clear and convincing evidence is "that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St.3d 469 (1954), paragraph three of the syllabus. When evidence of a less restrictive alternative to guardianship is introduced, the probate court must consider such evidence. R.C. 2111.02(C)(5). A probate court may deny guardianship based upon a finding that a less restrictive alternative to guardianship exists. R.C. 2111.02(C)(6).

{¶16} "In matters relating to guardianship, the probate court is required to act in the best interest of the ward." *In re Guardianship of Collins*, 12th Dist. Warren No. CA2013-08-072, 2014-Ohio-5750, ¶ 9, citing *In re Estate of Bednarczuk*, 80 Ohio App.3d 548, 551 (12th Dist.1992). "When an alleged incompetent objects to the appointment of a guardian, as is the case here, the probate court must be very cautious in proceeding." *Id.*, citing *In re Guardianship of Corless*, 2 Ohio App.3d 92, 94 (12th Dist.1981). A probate court, however, has broad discretion in appointing guardians and decisions regarding the appointment of a guardian will not be reversed on appeal absent an abuse of discretion. *Id.* at ¶ 10; *In re Guardianship of Smith*, 12th Dist. Butler No. CA2013-09-165, 2014-Ohio-2119, ¶ 19. An abuse of discretion connotes more than an error of law or judgment; it implies that the trial court's attitude is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶17} Following our review of the record, we find Sperry presented clear and convincing evidence through the testimony of both expert and lay witnesses that Glasgow is incompetent and cannot take proper care of herself or her property. The evidence shows that Glasgow is physically impaired, either confined to her bed or a wheelchair, and is wholly dependent on others for her daily living needs. She cannot cook, clean, toilet herself, bathe herself, or reposition herself to avoid bedsores. Glasgow is also mentally impaired, as she suffers from dementia, mixed-type delusional disorder, and psychosis NOS. Both Dr. Marciani and Dr. Reed testified that Glasgow has impaired motor behavior, thought processes, memory, judgment, concentration, and comprehension. As a result, Glasgow lacks the mental decision-making capabilities to manage her finances or ensure her medical and daily living needs are met. Glasgow's impaired judgment and faulty decision-making contributed to her diabetes complications and the amputation of her toes. Despite the loss of her toes, Glasgow continues to refuse to take her insulin and other medications designed

to keep her healthy. Her impaired judgment and decision-making capabilities also led Glasgow to be over $315,000 in debt with Cedar Village, as she refuses to cooperate with nursing-home personnel's requests to complete a Medicaid application.

{¶18} Both Dr. Marciani and Dr. Reed agree that Glasgow's conditions are not reversible and are likely to worsen as time goes on. Both feel a guardianship of Glasgow's person and estate is in Glasgow's best interest. Neither are overly optimistic that Glasgow will be able to live independently or return to her home. Dr. Reed indicated it might be possible if Glasgow has a live-in caregiver and alterations and accommodations are made to the home to allow for a wheelchair. Dr. Marciani, however, feels Glasgow requires intensive, hands-on care that goes beyond what a traditional live-in caregiver could give. From Glasgow's testimony at the July 20, 2021 hearing, it does not appear that Glasgow had a realistic plan in place that would allow her to return to her home or pay for in-home care. Though Glasgow had arranged for the maintenance and care of her home and pets during her two-year stay at the nursing home by having her pets boarded and her bills put on autopay, Glasgow admitted her finances had been dwindling. When specifically asked about arranging for in-home care, Glasgow indicated she intended to ask her family doctor to write her a prescription for "Care Connection." However, Glasgow continued to maintain that she could independently live by herself in her home.

{¶19} Accordingly, based on the evidence introduced at the hearing, we find that the probate court acted within its discretion in concluding that there was not a less restrictive alternative to guardianship available and that guardianship of Glasgow and her estate was in Glasgow's best interest. We reject Glasgow's arguments that Dr. Marciani's and Dr. Reed's evaluations were unreliable, cursory, and inappropriate to fully evaluate her physical or mental condition. This court previously recognized that "in those cases in which the application for appointment of a guardian is contested, there should also be, a[t] a minimum,

one medical examination of the proposed ward conducted by an independent source appointed by the court. This examination should be thorough, not merely a fifteen minute examination supplemented by hearsay." *In re Guardianship of Corless*, 2 Ohio App.3d at 96. This process was followed with the appointment of Dr. Reed, who met with Glasgow for four hours. During this time, Dr. Reed conducted a variety of tests, including a mental status exam, a Short Blessed Test, the St. Louis University Mental Status Exam, the Rey Memory Tests, and the WASI-II tests. In addition to the four hours he spent examining Glasgow, the doctor spent more than three hours reviewing Glasgow's medical records and case history. He then spent six hours scoring, interpreting, and writing conclusions based on Glasgow's test scores. Dr. Reed's evaluation of Glasgow was thorough and reliable and the probate court was entitled to rely on it in determining whether a guardianship was necessary and in Glasgow's best interest.

{¶20} The court was also entitled to rely on Dr. Marciani's evaluation of Glasgow. Prior to writing her written evaluation, Dr. Marciani met with Glasgow for one hour and fifteen minutes, spoke with nurses who provided care to Glasgow, and reviewed various medical records and nursing home care charts for Glasgow. Dr. Marciani attempted to conduct several mental competency tests to supplement the observations she made while talking with Glasgow, but Glasgow was uncooperative and refused to comply with the tests. Dr. Marciani met with Glasgow a second time shortly before the July 20, 2021 hearing and again attempted to conduct mental competency tests on Glasgow, but Glasgow remained uncooperative. Nonetheless, based on her experience, training, and observations, Dr. Marciani was able to reach the conclusion that Glasgow was mentally and physically impaired and in need of a guardianship for her person and estate.

{¶21} The fact that Dr. Marciani was unable to run certain tests on Glasgow was raised on cross-examination by Glasgow's counsel. The probate court considered Dr.

Marciani's inability to conduct the tests in determining what weight to assign to her testimony. The court ultimately found Dr. Marciani's report and testimony about Glasgow's mental and physical conditions credible and consistent with Dr. Reed's testimony and report. We find that the probate court did not abuse its discretion in relying on Dr. Marciani's report and testimony. Such evidence was credible and relevant in determining that Glasgow was incompetent and a guardianship of her person and estate was necessary. We therefore overrule Glasgow's sole assignment of error.

{¶22} Judgment affirmed.

PIPER, P.J., and M. POWELL, J., concur.